**FIRST NATIONAL INSURANCE CO. OF AMERICA, Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORP., in its corporate capacity and as successor receiver, etc., Defendant.**

Nos. CIV. 96–1356–B (AJB), CIV. 91–1533–B.

United States District Court, S.D. California.

Sept. 26, 1997.

Teresa Cho, Long Beach, CA, for Plaintiff.

George C. Lazar, San Diego, CA, for Defendant.

## ORDER REGARDING COURT'S ORDER TO SHOW CAUSE HEARING

BREWSTER, District Judge.

This matter came on regularly for hearing on the Court's order for defendant to show cause why it should not be required to retain independent counsel to represent the receiv-

ership estate. After careful consideration of the papers filed by both parties, the Court hereby declines to order the retention of independent counsel.

### I. Statement of Facts

First National, plaintiff in this action, issued an insurance policy to Imperial Savings ("Imperial"), American Savings & Loan Association, and ICA Mortgage Corporation. This umbrella policy covered all real property on which Imperial was a mortgagee. General Accident Insurance Co. ("General") issued a builders risk commercial fire policy covering the El Cajon Garden Apartments on which Imperial was listed as the mortgagee. The General and First National policy limits were $8 million and $1 million, respectively. In June of 1990, the federal government determined that Imperial was in unsound condition and appointed the Resolution Trust Corporation ("RTC") as receiver for Imperial. The FDIC, as the successor to the RTC, is the defendant in this action.

On February 27, 1991, fire destroyed the apartments. The RTC submitted claims for fire loss to First National and General. First National eventually paid its policy limit of $1 million, but General denied coverage on the ground that it had sent a notice of cancellation for nonpayment of premiums that was effective February 25, 1991.[1] Imperial could not determine from its records whether it had received notice of the cancellation or not, so it requested another copy of the cancellation notice from General. When Imperial received the copy, it noted that the Post Office Box number on the notice of cancellation was incorrect, and because of this fact, Imperial concluded that it had not received notification of cancellation for nonpayment of premiums.

General made repeated requests to Imperial and RTC to have pertinent Imperial employees submit to statements under oath regarding Imperial's receipt of the notice of cancellation, among other issues, but RTC initially refused these requests. On November 15, 1991, RTC agreed to produce Imperial employees for examination under oath;

---

**1.** There appears to be no claim that the renewal premium had been paid by the insured.

however, when RTC learned of the suit General filed against it, RTC withdrew its agreement to produce these witnesses. RTC maintained that it would not submit employees to examinations under oath absent a formal notice and scheduling of a deposition.

## II. Statement of the Case

### A. The First Suit—Civil Case No. 91–1533

General filed a declaratory relief suit against RTC on October 25, 1991, Civ. No. 9115–33, alleging that RTC forfeited its right to payment under the General policy due to its refusal to cooperate with General's investigation. RTC counterclaimed for bad faith and breach of contract, alleging that the fire loss at the El Cajon Garden Apartments was a covered occurrence under the General policy.

On August 17, 1992, RTC and First National reached a settlement in which First National agreed to advance the policy limit of $1,000,000 for the fire loss, but reserved subrogation rights should RTC receive any money from General.

General moved for summary judgment on RTC's bad faith claim and on its own claim for declaratory relief On January 5, 1993, the court granted summary judgment for General on RTC's bad faith claim, and denied General's motion for summary judgment on the coverage claim on the ground that the General policy requiring examinations under oath was not applicable to the RTC.

On June 1, 1993, First National filed a complaint in intervention, seeking to recover a portion of the $1 million it paid to RTC from General pursuant to its subrogation rights. The suit eventually went to trial on the merits of whether the fire was an occurrence covered by General's policy and whether First National was entitled to recover some of the money it had paid to RTC. The trial court found that the fire loss was a covered occurrence under the General policy and that First National was entitled to recover a portion of the amount it had paid to RTC. The Court apportioned the fire loss between First National and General *pro rata.*

General appealed the trial court's denial of summary judgment on the issue of whether RTC's refusal to cooperate forfeited its rights to the insurance policy proceeds. RTC appealed the court's grant of summary judgment on its bad faith claim, and First National appealed the trial court's apportionment of the loss between First National and General. On May 30, 1995, the Ninth Circuit reversed the trial court's denial of General's summary judgment motion on its complaint for declaratory relief, holding that RTC had been required to submit Imperial's employees to examination under oath at General's request, and that RTC's failure to comply was prejudicial to General's resolution of the fire loss claim. As a result, the Ninth Circuit held that RTC had forfeited its rights under the General policy. The Ninth Circuit vacated the judgment entered after trial on the complaint, counterclaim and complaint in intervention, and remanded the matter to the district court. The district court entered judgment in favor of General on the complaint and counterclaim, but the court never entered judgment on the complaint in intervention, so it remains pending. On January 7, 1997, Case No. 91–1533 was transferred to this Court, and the Court consolidated it with the instant case (Civ. Case No. 96–1356).

### B. The Second Suit—Civil Case No. 96–1356

In July 1996, First National filed suit against the FDIC in its corporate capacity and as successor receiver for Imperial Savings, contending that RTC's refusal to comply with General's demands to examine Imperial employees under oath constitutes a material breach of the settlement agreement between First National and RTC because it jeopardized First National's subrogation rights. First National also claims that RTC's failure to cooperate with General caused its subrogation rights to be extinguished in violation of the covenant of good faith and fair dealing. Complaint ¶¶ 33–36. First National seeks compensatory damages, prejudgment interest and an award of attorneys' fees.

In May 1997, after ruling on several motions, the Court narrowed the inquiry in the

case to two remaining issues: (1) was the General policy valid and collectible at the time of the fire loss, and if so (2) what is the extent of the First National policy obligation to indemnify for the fire loss by virtue of the other insurance clauses of both policies. In August 1997, the Court found that General's notice of termination was defective, and that if the General policy is found to have been valid and collectible, then the fire loss will be divided *pro rata* based on the policy limits of the General and First National insurance policies.

The purpose of this order is to determine which entities would bear the burden of any judgment awarded to First National. In May, the Court granted FDIC's motion to dismiss the FDIC in its "corporate" capacity ("FDIC-corporate"). While the dismissal of FDIC-corporate left the FDIC in its receivership capacity ("FDIC-receiver") as the only defendant, the Court remained concerned that the controversy might be prolonged by a claim by the receivership (or its creditors) for indemnification against the United States if the estate's liability was founded upon FDIC misconduct. In August 1997, the court ordered the FDIC to answer whether any judgment would be paid from receiver funds or FDIC funds, and, if the former, whether a possible conflict of interest existed between the estate and the FDIC. If it were possible that the funds for a judgment could ultimately draw from any source other than the estate, then the estate was entitled to separate counsel. Therefore, the court ordered the FDIC to show cause why it should not be required to retain independent counsel to represent the receivership estate, and set a hearing for September 15, 1997.

### III. Analysis

■ FDIC's counsel has a conflict of interest in this case if any entity other than the receivership estate could ultimately bear the burden of any judgment. Responsibility for the judgment can arise in two ways: (1) directly, from a court's judgment award in this case; or (2) indirectly, from a successful indemnification claim by the estate or its creditors. If there is no other possible

source of funds for a judgment, and if neither the estate nor the creditor could make an indemnification claim against the United States, then no conflict could exist because there would be no divergent interests within the defense of the suit. In this scenario, the estate would either be liable or not, but the outcome would have no legal effect on the federal government or any other entity or person.

### A. Judgment in this suit

■ In this suit, the plaintiff can only recover from FDIC-receiver now that FDIC-corporate has been dismissed. The plaintiff's complaint named as defendants both the FDIC in its corporate capacity and the FDIC in its capacity as successor receiver of Imperial. The Ninth Circuit has recognized that the FDIC "is empowered to act in 'two entirely separate and distinct capacities' in proceedings involving an insured state bank." *FDIC v. Nichols,* 885 F.2d 633, 636 (9th Cir.1989); *Woodbridge Plaza v. Bank of Irvine,* 815 F.2d 538, 544–545 (9th Cir.1987) (dissent). The Circuit recognized that "a distinction must be drawn between FDIC's dual capacity as federal insurer of deposits and as liquidating agent for the bank." *FDIC v. Glickman,* 450 F.2d 416, 418 (9th Cir.1971). When the FDIC acts as a receiver it stands in the shoes of the insolvent bank, and when it acts as insurer, it acts as a government agency. *Id.* The Court noted in that case that the FDIC was represented by private counsel rather than the United States Attorney because it was acting as receiver rather than in its governmental capacity.[2] *Id.* The Court held that "the United States government and the FDIC are not the same person for purposes of making applicable the hearsay exception." *Id.*

In *British Columbia Investment Co. v. FDIC,* 420 F.Supp. 1217, 1223 (S.D.Cal.1976), defendants in a suit brought by FDIC-receiver attempted to raise fraudulent activity by FDIC-corporate as a defense. Noting FDIC's two independent roles, the Court held that "[e]lementary fairness to the insolvent bank's shareholders and creditors dic-

---

**2.** In this case, the FDIC is also represented by private counsel.

tates that FDIC, when discharging its statutory duty as receiver, not be held responsible for acts of FDIC in its normal corporate capacity." *Id.* The Court went on to explain that "[t]he very existence of the dual capacities of FDIC, as emphasized in *FDIC v. Glickman,* 450 F.2d 416, 418 (9th Cir.1971) necessarily indicates that the receiver's constituents, the insolvent bank's shareholders and creditors, not be responsible for alleged wrongdoing done by the corporation acting on behalf of the public." *Id.,* at 1223 n. 7. In this case, First National seeks to hold FDIC-corporate liable for acts of FDIC-receiver. Logic suggests that if FDIC-receiver cannot be held liable for acts of FDIC-corporate, the converse should also be true. The reasoning behind the court's decision was that the bank shareholders should not be liable for wrongdoing by a federal agency. Similarly, insured banks should not have their insurance fund used to pay for wrongdoing by a receiver for an insolvent bank. Furthermore, Congress has attached special priority to the preservation and protection of FDIC's insurance funds. See, e.g. *Atherton v. FDIC,* —— U.S. ——, ——, 117 S.Ct. 666, 675, 136 L.Ed.2d 656 (1997). On these grounds, the Court found that FDIC-corporate cannot be liable for the acts of FDIC as receiver, and dismissed FDIC-corporate as defendant. Because FDIC-receiver is the only remaining defendant, any judgment would be borne by it alone.

## B. Indemnification

While any judgment would be absorbed by the estate, the Court in its August 1997 order expressed concern that FDIC counsel might have a conflict of interest if the receivership estate could later state a viable claim for indemnification against the United States for the misfeasance of the FDIC in its receivership role. To decrease the likelihood of an additional round of litigation, the court sought by its order to ensure that all potential responsible parties had their interests represented separately in the present case. The FDIC's response brief indicates that it intends to pay any judgment in this case from the receivership estate, creating the

appearance of a conflict. However, if there is no possible claim of indemnification that can be made by the receivership, then the FDIC has no interests to represent other than those of the estate, and no conflict would exist.

With FDIC-corporate immune from liability in this case, the only possible target for indemnification would be the United States. The Court need not determine whether the federal government is in fact liable for the acts of the FDIC as receiver until it first decides whether jurisdiction for such a claim exists.

### 1. Sovereign Immunity

■ Since the early days of the Republic, the courts have recognized the principle of sovereign immunity, which bars all suits against the United States except when expressly authorized by Congress. See, e.g., *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 411–412, 5 L.Ed. 257 (1821), *United States v. Lee,* 106 U.S. 196, 205, 1 S.Ct. 240, 247–248, 27 L.Ed. 171 (1882). The roots of the concept date to the English law axiom that "the King can do no wrong." [3] A waiver of sovereign immunity must be clear, express, and unambiguous; it cannot be implied from vague language. *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941).

Congress has authorized suits against the United States government seeking monetary damages for certain torts under the Federal Tort Claims Act; for some contract claims under the Tucker Act; and in other statutes that provide a cause of action for a specific type of claim. The only statute in this third category that the Court has been given reason by the parties to consider is 12 U.S.C. § 1821.

### 2. Federal Tort Claims Act

■ The Plaintiff has not alleged a tort cause of action in its complaint. However, were it to bring, on behalf of the receiver, a tort action against the United States for negligent misfeasance by the FDIC-receiver, the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.,* would apply. The FTCA generally permits suits against the

**3.** 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAW OF ENGLAND 244,246.

United States for the negligent torts of its employees.

However, the acts of the FDIC-receiver in this case would not be subject to the FTCA because of the discretionary function exception. The exception bars "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In 1991, the Supreme Court found that the FDIC engaged in an exempt discretionary function when it managed a receivership estate. "Day-to-day management of banking affairs, like the management of other businesses, regularly requires judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level. '[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.'" *United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 1275, 113 L.Ed.2d 335 (1991), *citing United States v. Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984).

In this case, the FDIC-receiver's decision to withhold Imperial employees from the investigation was a discretionary decision made in the shadows of complex federal litigation and multimillion dollar insurance claims. The outcome of these issues would impact not only the receivership, but significant federal interests regarding the recovery from the savings and loan crisis. While the FTCA rectifies the injustice of a pedestrian lacking recovery from a negligent postal driver, it will not be held to handcuff or intimidate federal employees who must make important decisions affecting federal policy, even when made at an operational level such as an FDIC receivership. Therefore, this avenue of recovery against the United States is closed in this case.

### 3. Contract Claims

Plaintiff's complaint possibly alludes to a breach of contract claim against the United States by seeking relief from FDIC-corporate. Now that FDIC-corporate has been dismissed, this possibility need no longer be considered. However, to determine whether a conflict of interest exists between the estate and the FDIC in sharing counsel, the Court will evaluate all possible claims that could be made against the United States in this suit or future indemnification actions.

There are only three contracts that create relevant interests in the parties: the August 17, 1992 agreement between First National, and RTC and Imperial's two insurance policies with First National and General. Claims against the United States under the two insurance policies can be readily dismissed. Because the United States was not a party to either agreement, any interference on its part would give rise to an action in tort, not contract. As discussed above, the United States would not be liable in tort for the actions taken by FDIC-receiver. Therefore, the only basis for a claim by First National lies in its August 1992 agreement with RTC.

On or about August 17, 1992, First National paid RTC $1 million pursuant to its insurance policy with Imperial. In settling the claim, the parties signed a settlement agreement, the relevant part of which provides:

> In the event that General Accident indemnifies the RTC for its loss under the fire, either voluntarily, involuntarily or pursuant to a final judgment of a Court or arbitration ruling, any such sums paid will be subject to the subrogation provisions under the [First National] policy.

The agreement also states that "[e]ach of the parties hereto agrees ... [to] take such other action as may be necessary and convenient to carry out the purposes of this Agreement more effectively." First National contends that RTC breached this agreement by causing First National's subrogation rights to be terminated.

■ As with tort claims, sovereign immunity bars all contract claims against the federal government except those authorized by

Congress. Typically, the only basis for claiming Congressional waiver of sovereign immunity for contract claims is the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). The Act generally limits district court jurisdiction to claims for less than $10,000, while claims for more than $10,000, such as First National's, are under the exclusive jurisdiction of the Claims Court. However, the Ninth Circuit held that FIRREA[4] expands district court jurisdiction to include contract claims of more than $10,000 when the FDIC is a party. *American International Enterprises v. FDIC,* 3 F.3d 1263, 1266–1267 (9th Cir. 1993).

Therefore, the possibility of a valid claim by First National, either in this Court or the Claims Court, creates a potential conflict for FDIC counsel in its representation of the receivership. However, the Court has already determined by summary adjudication that First National does not have a viable claim for breach from its agreement with the RTC. In its May 1997 order, the Court held that any uncooperative behavior by RTC took place prior to the settlement agreement. The refusal to cooperate occurred in 1991, and the settlement agreement was signed in August of 1992. Thus, uncooperative behavior by RTC could not have constituted a breach because the settlement agreement did not then exist.

Therefore, neither First National nor the receivership can make a valid contract claim against the United States in either a District Court or the Claims Court.

#### 4. FIRREA

While the FTCA and the Tucker Act are the primary vehicles for bringing actions for monetary relief against the United States, some statutes provide additional waivers of sovereign immunity for specific situations. These statutes must be strictly construed. As noted above, "A waiver of sovereign immunity must be clear, express, and unambiguous; it cannot be implied from vague language." *United States v. Sherwood, supra.* The only possible statutory scheme suggested by the parties is FIRREA, the relevant portion of which is found at 12 U.S.C. § 1821.

However, the language of § 1821 limits narrowly the range of actions that can be taken to recover from a receivership. Section 1821(d)(13)(D)(ii) provides that, except as provided in FIRREA's statutory claim procedures, "no court shall have jurisdiction over any claim relating to any act or omission of such institution [the failed bank] or the Corporation as receiver." Furthermore, § 1821(d)(20) provides that any judgment against a receiver for a post-receivership breach "shall be paid as an administrative expense of the receiver or conservator." While the statute permits district court jurisdiction after the administrative claims process has been completed, these subsections strongly suggest that a judgment in this case, if any, is solely the responsibility of the receivership estate.

The Court could imagine scenarios in which FIRREA's claim provisions might be inappropriate for the claims of non-creditors against a receivership, and the parties cite several cases that discuss that issue. See, e.g., *Homeland Stores v. RTC,* 17 F.3d 1269, 1274 (10th Cir.1994). However, while the possibilities for recovery against the receivership might be debatable, the statute plainly lacks evidence of Congressional intent to waive sovereign immunity that would allow recovery from the United States. Because interpretations involving sovereign immunity must be strictly construed, the court will not infer a waiver where none is explicitly provided. Therefore, there is no basis for recovery against the United States under § 1821.

### IV. Summary

While the interests of the receivership and the FDIC may diverge hypothetically, if no legal means exist for the estate to seek recovery, then the government and the FDIC have no interests other than those of the estate to represent. The doctrine of sovereign immunity bars any suit against the United States unless authorized by Congress. Under the only possible avenues apparent to the court-the Federal Tort Claims Act, the Tucker Act, and FIRREA-none provide a

---

4. Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L.No. 101–73, 103 Stat. 183 (codified at 12 U.S.C. § 1811 et seq. (1991)).

basis for waiving sovereign immunity under the facts of this case. Therefore, the Court finds that it is unnecessary to require the FDIC to retain independent counsel to represent the receivership estate.

IT IS SO ORDERED.